## 38619. THE STATE v. HANSON.

Clarke, Justice.

We granted certiorari in order to answer the question whether the trial court should have granted Hanson's motion to quash an indictment against him because the district attorney had granted him transactional immunity.

Hanson was arrested in DeKalb County in 1979 for possession

and sale of methaqualone in violation of the Controlled Substances Act. In exchange for some cooperation in furnishing information concerning drug and gambling investigations, the district attorney gave Hanson a letter in which he purported to grant immunity from prosecution for all violations of the law within his jurisdiction prior to September 8, 1980. A DeKalb County judge also signed a postscript to the letter which noted that the letter had been called to the attention of the court. At about the same time the district attorney dismissed the charges pending against Hanson. The dismissal was noted on the file, the notation giving no reason for the dismissal.

After the district attorney was defeated in his bid for re-election, the new district attorney submitted the dismissed cases to the grand jury, which indicted Hanson for possession and sale of methaqualone. Hanson's attorney filed a motion to quash the indictment, relying upon the letter from the former district attorney. There was no copy of this letter in the case file. The trial court denied the motion, and the Court of Appeals reversed, holding that the promises of the public prosecutor and the public faith pledged by him must be kept. *Hanson v. State,* 161 Ga. App. 536 (289 SE2d 280) (1982). We affirm.

In affirming it is necessary to address four issues: (1) Was Hanson entitled to either a common law transactional immunity or to the use and derivative use immunity provided by Code Ann. § 38-1715? (2) If not, did the prosecutor have the power to promise to forgo prosecution in exchange for information? (3) If the promise were valid, to what extent was it binding? (4) If the promise were valid and binding, did it bind the prosecutor's successor in office?

1. In England and this country, for over two centuries amnesty has been extended to individual offenders or classes of offenders in exchange for incriminating information. This practice is particularly useful in the context of offenses for which "... proof and punishment were otherwise impracticable because of the implication in the offense itself of all who could bear useful testimony." 8 Wigmore, *Evidence,* § 2281 (McNaughton Rev. 1961) at 492. The removal of penal consequences is referred to in this country as immunity, which "... signifies the beneficial *result to the offender* ... " as opposed to amnesty, which " . . . signifies the sacrificial *act on the part of the state*." Id. at 493.

A grant of immunity may be given in many different contexts — as part of a plea bargain, in exchange for testimony or confession, or in exchange for other evidence. Where the defendant relinquishes valuable constitutional rights in exchange for immunity, the question of enforcement of the bargain has constitutional overtones. This is true whether the rights relinquished are Sixth Amendment rights, as in the case of a plea bargain, or Fifth Amendment rights, as in the case

of a confession or incriminating testimony.

The immunity granted in exchange for *compelled* testimony must be sufficiently broad to protect the witness to the extent of his Fifth Amendment privilege against self-incrimination. The immunity granted may be "transactional," which protects the person testifying against prosecution for any transaction touched on in his testimony whether or not his involvement can be independently proven. A more limited immunity, "use and derivative use" immunity, protects the witness from the use of either the incriminating testimony or the fruits of such testimony.[1] The first federal immunity statute, passed in 1857, provided immunity to anyone testifying before either house of Congress for any fact or act upon which he touched in his testimony. 11 Stat. 155-156 (1857). This very broad protection encouraged so-called "immunity baths." To gain immunity, witnesses testified in droves before congressional committees as to offenses both relevant and unrelated to matters under investigation. Comment, *Immunity Grants to Suspected Criminals to Secure Testimony,* 18 Loyola L. Rev. 115 (1971-72). This situation led Congress to substitute a statute which provided only use immunity and which made no provision for immunity from derivative use of the incriminating testimony. 12 Stat. 333 (1862). In Counselman v. Hitchcock, 142 U. S. 547 (12 SC 195, 35 LE 1110) (1892), the United States Supreme Court held that use immunity did not adequately compensate a witness whose testimony was compelled for the loss of his Fifth Amendment privilege against self-incrimination and found that ". . . a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates." Id. at 548. The prohibition against a grant of use immunity was extended to the states in Malloy v. Hogan, 378 U. S. 1 (84 SC 1489, 12 LE2d 653) (1964). Although in Murphy v. Waterfront Comm. of N. Y. Harbor, 378 U. S. 52 (84 SC 1594, 12 LE2d 678) (1964), the court recognized the concept of use immunity and implied that it might be constitutionally valid if the witness were protected from derivative use as well as direct use, it was not until the decision of Kastigar v. United States, 406 U. S. 441 (92 SC 1653, 32 LE2d 212) (1972), that the concept was explicitly declared constitutional.

---

[1] Part of the confusion in analysis in this area comes from the use of the term "immunity." "[T]he basic purpose of a grant of immunity is to permit the compulsion of testimony which otherwise would be privileged by the fifth amendment." United States v. Weiss, 599 F2d 730, 737 (5th Cir. 1979). The confusion occurs when a grant of immunity in exchange for a valuable constitutional right is approached analytically in the same way as an exercise of prosecutorial discretion in the decision

In 1975 the Georgia Legislature passed the Georgia Witness Immunity Act, Ga. L. 1975, pp. 727, 728, Code Ann. § 38-1715, which provides use immunity for a witness compelled to testify. We have held that this statute provides constitutional protection adequate to compel testimony. *Brooks v. State,* 238 Ga. 435 (233 SE2d 208) (1977). There is no statutory authority for a general grant of transactional immunity in Georgia. Whether or not a grant of transactional immunity by a prosecutor absent statutory authority is valid has been declared an open question. *Corson v. Hames,* 239 Ga. 534 (238 SE2d 75) (1977). The Court of Appeals in the present case has found that a "common law" transactional immunity exists in Georgia even though the statute provides for use immunity only. *Hanson v. State,* supra. After a diligent search we can find no indication of a common law transactional immunity in Georgia or anywhere else. Under the common law a witness in any case was entitled to refuse to answer whenever the answer would tend to incriminate. Literally, the constitutional protection of the Fifth Amendment does not extend as far as the common law rule, although the interpretation of the amendment has expanded its protection to that afforded at common law. Counselman v. Hitchcock, supra; *Higdon v. Heard,* 14 Ga. 255 (1853).[2] We conclude that no common law transactional immunity exists in Georgia in the sense of the protection of a witness who gives up a valuable right.

Since we have concluded that there is no common law transactional immunity in Georgia, the next question which must be considered is whether the district attorney had the authority to promise to forgo prosecution apart from the statutory authority granted in Code Ann. § 38-1715. The state argues that the statute is broad enough to encompass any agreement to excuse a person from prosecution and that the prosecutor could make no promise without following the procedure set out in the statute.[3] We do not agree. From

---

not to prosecute. We therefore confine our use of the term "immunity" to the protection afforded an individual who has given up a valuable constitutional right and use the term "promise to forgo prosecution" to describe the promise resulting from an exercise of prosecutorial discretion which has no constitutional overtones.

[2] The language of the Georgia Constitution, Art. I, Sec. I, Par. XIII, Code Ann. § 2-113, affords greater protection than the literal language of the Fifth Amendment to the United States Constitution.

[3] Code Ann. § 38-1715 provides in part: "Whenever in the judgment of the Attorney General or any district attorney, the testimony of any person or the production of evidence of any kind by any person in any criminal proceeding before a court or grand jury is necessary to the public interest, then the Attorney General or the district attorney may request the superior court, in writing, to so order that person to testify or produce the evidence."

the beginning of our criminal justice system prosecutors have exercised the power of prosecutorial discretion in deciding which defendants to prosecute. The prosecutor's bargaining power is a crucial factor in the disposition of criminal charges. Santobello v. New York, 404 U. S. 257 (92 SC 495, 30 LE2d 427) (1971). At common law the prosecutor had complete authority to enter a nolle prosequi until after the jury was sworn. Note, *Binding Effect of Prosecutor's Agreement to Dismiss Prosecution,* 23 Wayne L. Rev. 1129 (1975) (hereinafter cited as 23 Wayne L. Rev.). We find that this authority of the prosecutor to bargain is inherent in his office and is of utmost importance in the orderly administration of criminal justice. We conclude that although the language of Code Ann. § 38-1715 is theoretically broad enough to encompass all promises to forgo prosecution in exchange for evidence, there is no indication that the legislature intended Code Ann. § 38-1715 to apply except to the extraction of information in a situation in which the witness gives up a valuable right. The section is intended to extend the requisite constitutional protection in such a case.

Hanson neither engaged in a plea bargain nor was he compelled to testify. He apparently gave information in exchange for dismissal of charges against him and a promise of the prosecutor not to prosecute him for any crimes committed prior to September, 1980. As far as the record shows, he gave up no constitutional right. Therefore, he was not entitled to immunity for the purpose of constitutional protection.

2. Having decided that Hanson can claim neither a common law transactional immunity nor the use and derivative use immunity extended by Code Ann. § 38-1715, we are faced with the question whether and to what extent Hanson can claim the benefit of his bargain with the district attorney. The answer to this question depends upon whether the prosecutor had authority to make an agreement with Hanson and the extent of that authority. At common law the prosecutor enjoyed absolute control over the entry of a nolle prosequi until the jury was sworn. 23 Wayne L. Rev. at 1131. In some jurisdictions court approval for dismissal of criminal charges is required by statute. In such jurisdictions a good argument can be made that court approval is also necessary for a prosecutor's promise to dismiss charges. In Georgia court approval is necessary for entry of nolle prosequi, Code Ann. § 27-1801, but our statutes are silent as to the authority of the prosecutor to dismiss criminal charges prior to indictment. The question of the extent of that authority is, apparently, a question of first impression in Georgia. This is probably so because whereas agreements to refrain from prosecution are frequent, "[t]he matter is seldom questioned in the courts because

both sides are usually satisfied with and fulfill their part of the agreement." Note, *Immunity Agreement — A Bar to Prosecution,* 21 University of Miami L. Rev. 896, 897 (1967).

We find that the prosecutor, as part of the authority of his office, has the sole discretion to dismiss cases prior to indictment. The operation of his office and the fulfillment of his function in our criminal justice system demands that he have this power. As noted above, our statutes require that the prosecutor obtain court approval for the entry of a nolle prosequi. Logic would dictate that he also obtain court approval for an agreement to enter a nolle prosequi.

The questions remaining do not deal with the authority of the prosecutor to enter into an agreement to dismiss specific charges, to grant immunity in exchange for the relinquishment of valuable constitutional rights, or to enter a nolle prosequi. We must consider his authority to forgo prosecution in exchange for information or evidence which is not compelled and the necessity of his obtaining court approval before entering into such an agreement. We conclude that in the future court approval will be required.

Aside from the question whether court approval is necessary for an agreement to forgo prosecution, we must consider whether the prosecutor has the power to promise to forgo prosecution of all crimes committed by an individual in exchange for information or evidence. Such a blanket promise rises to the level of amnesty or a pardon. The power to grant pardons is traditionally a function of the executive and in Georgia is in the Pardon and Parole Board alone. Code Ann. §§ 2-2001, 2-2802. We find that while the prosecutor has, with court approval, the power to promise to forgo prosecution, this promise must be limited to prosecution as to specific crimes or transactions. Therefore, a valid promise to forgo prosecution based on prosecutorial discretion rather than on Code Ann. § 38-1715 must, first, contain a description of the crimes or transactions in regard to which an individual is excused from prosecution. Secondly, the prosecutor must obtain court approval of an agreement to forgo prosecution. We reiterate that court approval is not necessary to a mere decision to dismiss charges where there is no promise to forgo prosecution in the future.

3. Having declared the parameters of a valid promise to forgo prosecution, we conclude that the agreement involved in the case at hand was too broad to be enforceable in that it purported to insulate Hanson from prosecution for all crimes committed in the jurisdiction of the DeKalb County district attorney prior to September 8, 1980, the date of the agreement. This agreement, apparently covering all crimes known or unknown, is clearly too broad. The agreement recites that the promise is given in exchange for information and

assistance regarding drug and gambling investigations. The trial court found that the document did not reflect valid mutual consideration. However, the record reveals nothing which disputes the recital of consideration in the agreement. Assuming, then, that Hanson kept his part of the bargain, to what extent is he entitled to the benefit of an invalid promise by the prosecutor?

Not only has this question never been decided in Georgia, the answer is in flux in other jurisdictions as well. In United States v. Ford, 99 U. S. 594 (25 LE 399) (1878), the United States Supreme Court considered the enforceability of a promise which was beyond the authority of the prosecutor. Noting that it had been found that "[p]ublic policy and the great ends of justice . . . require that the arrangement between the public prosecutor and the [defendant] be carried out," the court held that the defendant was not entitled to plead the contract in bar of proceedings against him but was entitled only to an equitable right to executive clemency.

The rule of U.S. v. Ford, supra, that the promise of a prosecutor, which is beyond the scope of his authority, entitles the defendant only to an equitable right to executive clemency, which is not binding on the state and may not be pled as a bar, was followed for a period of time. See, e.g., Cortes v. State, 135 Fla. 589 (185 S 323) (1938); Ingram v. Prescott, 111 Fla. 320 (149 S 369) (1933); State v. Guild, 149 Mo. 370 (50 SW 909) (1899); Whitney v. State, 53 Neb. 287 (73 NW 696) (1898). This rule has now been relaxed in some jurisdictions, which will enforce the prosecutor's promise in varying degrees. In some jurisdictions the courts consider the promise, at least where it has been approved by the court, a pledge of public faith and have found the promise enforceable on the basis that a public pledge must be kept. Butler v. State, 228 S2d 421 (Fla. 1969); State v. Davis, 188 S2d 24 (Fla. App. 1966); State v. Ward, 112 W. Va. 552 (165 SE 803) (1932). In a few jurisdictions, a narrower approach is taken and the promises are analyzed on a case-by-case basis by applying contract law. State v. Ashby, 81 N.J.Super. 350 (195 A2d 635) (1963), revd. 43 N.J. 273 (204 A2d 1) (1964) (the reversal required enforcement of the prosecutor's bargain under public policy analysis). Finally, under the most narrow approach the problem of enforcement can be analyzed in terms of prejudice to the promisee and the promise enforced to the extent that he has been prejudiced. See, e.g., United States v. Goodrich, 493 F2d 390 (9th Cir. 1974); James v. State, 305 S2d 829 (Fla. App. 1975).

In *Smith v. State,* 74 Ga. App. 777 (41 SE2d 541) (1947), the state's attorney had an agreement with Smith's accomplice Seals that if Seals would testify against Smith before the grand jury and at trial Seals would be released from public work camp. The question in

*Smith v. State* was whether the trial judge who approved the agreement and signed the order releasing Seals should be disqualified. The court found that he was not disqualified. There is dicta in the discussion of this question which is relevant to the question before us. The *Smith* court quoted with approval language from Ingram v. Prescott, supra, that: "[O]n the ground of public policy, it has been uniformly held that a State may contract with a criminal for his exemption from prosecution if he shall honestly and fairly make a full disclosure of the crime, whether the party testified against is convicted, or not. . . . Although it is universally conceded that the district attorney . . . may, with the consent of the court, enter into an agreement with an accomplice that if he will testify fully and fairly, in a prosecution against his accomplices in guilt, he shall not be prosecuted for the same offense, and that if the accomplice performs on his part, he is entitled to such protection as the law affords, yet the weight of authority upholds the proposition that if such an agreement is made with the prosecuting attorney alone, without the consent or advice of the court, it is of no effect as a protection to the accomplice, if he is afterwards placed on trial in violation of that agreement." *Smith v. State,* supra at 785. The *Smith* court went on to say, "While it is true that in the case at bar Seals was not offered immunity from prosecution, he was given a release from serving his sentence on the public works. We can discern no difference between the principle of law applicable to both situations." Id. at 786.[4]

Thus in this state it has been indicated, although not decided, that a prosecutor may make an agreement to forgo prosecution only with the approval of the court. Further, the language in *Smith* indicated that the agreement may be considered as a contract and that public policy dictates that the prosecutor have the authority to make such contracts with the court's approval. While a slavish adherence to contract law should be avoided, we find that analysis of the present agreement as a contract between the prosecutor and Hanson is useful. The parties made a bargain. There is no evidence in the record that Hanson failed to live up to his part of the bargain. Ordinarily, therefore, he would be entitled to the benefit of his bargain. We have found that court approval is necessary to make a promise to forgo prosecution binding. Here there was no specific approval although the court has indicated that the agreement was brought to its attention. We find that inasmuch as there was

---

[4] Since the validity of Seal's release was not before it, the court did not address the argument that the court had exceeded its authority in ordering release in that this authority was vested solely in the Prison Board.

previously no requirement of court approval, the procedure adopted in Division 2 above is required prospectively only, and we refuse to find the instant agreement invalid for lack of approval.

The question of court approval aside, we find that the terms of this agreement are beyond the power of the prosecutor to grant, being in the nature of a blanket amnesty or pardon. Public policy demands, however, that the fact that the agreement was ultra vires should not cause it to fail entirely. We therefore hold that to the extent that a promise to forgo prosecution could be validly made to Hanson, such an agreement is deemed to have been made.

In the light of the circumstances surrounding the agreement here, including the dismissal of specific charges, we find that the agreement not to prosecute is binding as to those charges, including the subject of the indictment here. In the future, an agreement to forgo prosecution must be in writing, must specifically set forth the transactions to which the promise relates, and must be approved by the court. We find that the agreement between Hanson and the district attorney is enforceable as a bar to the present indictment.

4. The final question, whether the agreement is binding on the district attorney's successor in office, must be answered in the affirmative. The integrity of the office of the district attorney demands that promises made by the district attorney are binding on his successor to the extent that they are valid and enforceable.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 8, 1982.

*Robert E. Wilson, District Attorney, Ann Poe Mitchell, Assistant District Attorney,* for appellant.
*Hardaway Young III,* for appellee.