A93A1770. THE STATE v. DEAN.
(442 SE2d 830)

ANDREWS, Judge.

The State appeals the trial court's grant of State Senator Dean's plea in bar to charges of making a false writing, OCGA § 16-10-20. We affirm.

The underlying facts of this dispute are not contested. In 1987, the Georgia Department of Community Affairs and the Polk County Board of Commissioners entered into an agreement by which the Department agreed to a grant of $20,000 to the County. The County agreed to "conduct conceptual planning, feasibility studies, and cost benefit analysis of possible improvements to a County-wide water and sewer system." Initially, $10,000 was dispensed, with the remainder due upon "receipt of certification by the County that the project has been completed."

Prior to 1987, the Department and its grantees had believed that the use of grant money for actual construction was legal. In 1987, the Attorney General opined that such monies could only be used for "planning." Therefore, the Department, according to Commissioner Higdon, began to restructure their grant programs around "planning."

On May 3, 1989, McElwee, the county manager, sent a letter to Higdon stating that "[t]he improvements of the Polk County water

and sewer system have been completed, and we are requesting the final payment of $10,000." A copy was noted as having been sent to Senator Dean, who represented Polk County and the City of Rockmart in Polk County.

Grants were also being made by the Department to other political subdivisions located in Senator Dean's district during this period of time, including Rockmart.

At the hearing on the plea in bar, Dean presented the testimony of Deputy Attorney General Hobbs[1] concerning the genesis of the dispute between the Department and Dean which resulted in the "Full Release" at issue. Hobbs testified that "My recollection is that there was an audit done by the City of Rockmart [in 1991] and that *a review of grants* received by the Department of Community Affairs by the City of Rockmart was the subject of that audit, and not Polk County, Paulding County, and the other local governments. . . . I feel pretty confident that the *audit that brought rise to the issues that were dealt with with respect to that release* was an audit done for the City of Rockmart." (Emphasis supplied.)

The audit determined that, although none of the grant money was misappropriated by anyone for their personal use, some grant money had gone for public or "publicly beneficial" programs other than those for which it was intended. A letter was sent by the Department to the City of Rockmart, its mayor, its city manager, and Senator Dean, demanding repayment of a total of $53,700. Hobbs acknowledged that the State had no evidence that Dean personally benefitted from any grant to any political subdivision in his district, including those to Rockmart and Polk County.

As a result of the demand letter, Dean and the others obtained counsel and negotiated a settlement with the Department of Community Affairs, represented by Hobbs, pursuant to which Dean agreed to pay $15,000. That money was paid on March 22, 1992 and has not been returned.

Sometime after December 1991, prior to the return of the indictment at issue on December 22, 1992, and in conjunction with Dean's payment of the $15,000, a document entitled "FULL RELEASE" was signed by Commissioner Higdon for the "Department of Community Affairs, an Agency of State Government of the State of Georgia." Deputy Attorney General Hobbs negotiated the language of the release on behalf of the Department and signed the release as a witness.

Included in that release are the following paragraphs.

"On December 6, 1991, the Department of Community Affairs, an

---

[1] Hobbs was one of three such Deputy Attorneys General. These three served under Executive Assistant Attorney General Michael, who reported to Attorney General Bowers. Hobbs was the deputy who coordinated litigation for the State and its agencies.

agency of State Government of the State of Georgia (DCA) mailed to [Dean], the City of Rockmart, and [the mayor and city manager of Rockmart], a certain letter stating, among other things, that [the Releasees] owed DCA the sum of at least [$53,700] as a result of certain claims being made by DCA, said claims being more particularly set forth in the letter. . . .

"It is the intention of this FULL RELEASE to compromise, settle and forever end all possible claims and issues and to end any and all potential litigation between and amongst DCA and RELEASEES, with respect to any dealings whatsoever by, between or among DCA and RELEASEES prior to the date of this FULL RELEASE. This FULL RELEASE is intended to encompass, but is not limited to, *any and all such claims*, whether based on federal or state law, whether arising by action of DCA, any of its agents or affiliates, arising from any alleged claim, *either criminal*, civil, tortious, contractual or upon any other legal or equitable theory of recovery whatsoever *which DCA now claims, which could in any manner be asserted by it or which may hereafter accrue or otherwise be acquired, on account of, or arising out of any matter or occurrence among the parties prior to date of this FULL RELEASE.*" (Emphasis supplied.)

No copy of the demand letter was included in the record below, as pointed out by the dissent. Both parties, however, by the terms of the release, which is in evidence, acknowledge the sending and receipt of the letter and that it precipitated the negotiations and release. Therefore, its existence, if not its exact content, is properly considered by this court.

On December 22, 1992, a special presentment, reflecting on its face that it was prepared by Attorney General Bowers and the Fulton County District Attorney, was returned by the grand jury, charging Dean with making a false writing, specifically, the letter of May 3, 1989, signed by McElwee and copied to Dean. The falsity alleged was that there was "no water and sewer system owned by Polk County, and Polk County had not spent the first $10,000 . . . for development of a water and sewer system."

1. The plea in bar was made and sustained by the trial court. The State's opposition to the plea was based on the contention that, before the State could be prohibited from a future prosecution of a criminal defendant, "a document must contain a description of the crime or transactions in which the individual is excused from prosecution, and court approval is required of the agreement to forego the prosecution. *State v. Hanson*, 249 Ga. 739, 744 (295 SE2d 297) (1982)."

That case contains a thorough discussion of the evolution of OCGA § 24-9-28, the Witness Immunity Act, as well as the differences in "transactional" and "use" immunity when compared to "the

exercise of prosecutorial discretion."[2] The latter involves the discretion of a prosecutor exercised in deciding which defendants to prosecute and is involved here.

As held in *Hanson*, a prosecutor has the power to forego prosecution as long as the promise contains a "description of the crimes or 'transactions' " in regard to which an individual is excused from prosecution, and the promise is approved by the court. The second prong has been fulfilled here because the court's order granting the plea in bar specifically "approved" the agreement.

While acknowledging that the DCA made all the grants at issue, both those which precipitated the audit letter and those which are the subject of the indictment, the State argues that the apparently all encompassing language of the "Full Release" did not amount to an adequate description of the transaction for purposes of binding the State under *Hanson* as to the Polk County grants. The State does not dispute that an agreement was bargained for and reached, compare *Lee v. King*, 263 Ga. 116, 117 (2) (428 SE2d 326) (1993), only that it included the Polk County grants.

The trial court determined as a matter of fact from the testimony as well as from the four corners of the document itself that the intent of the parties to the Full Release was to settle all matters, civil and criminal, between the State of Georgia and Dean relating to all DCA grants, including the Polk County one, and we find no legal error in her conclusion. Even in *Hanson*, when the agreement was found to be beyond the authority of the prosecutor because it amounted to blanket amnesty for any and all violations in his jurisdiction before September 8, 1980, the Supreme Court concluded that "[t]he parties made a bargain," and Hanson was entitled to its benefit as to the prosecution which he sought to quash.

This case is also distinguishable factually from *Hanson* in that, there, an arrest had already occurred and a warrant had been issued, although no indictment had yet been presented to the grand jury. These charges were dismissed in exchange for the letter. As *Hanson* states, "our statutes are silent as to the authority of the prosecutor to *dismiss criminal charges prior to indictment*." *Hanson*, supra at 743 (2).

Here, there was no criminal charge pending, only the knowledge that public monies allocated for one purpose had been expended for another and an attempt to resolve all matters, civil and criminal, which had occurred between Dean and the DCA before the date of

---

[2] "Immunity" is confined to the protection afforded an individual who has given up a valuable constitutional right and the term "promise to forgo prosecution" is used to describe the exercise of prosecutorial discretion with no constitutional overtones. *Hanson*, supra at n. 1.

the signing of the release. While DCA may not have been authorized to resolve potential criminal exposure, the Attorney General of this State is so authorized. Ga. Const. 1983, Art. V, Sec. III, Par. IV; *Brown v. State*, 177 Ga. App. 284, 292 (7) (339 SE2d 332) (1985) (discussing the Attorney General's dual roles as prosecutor and legal advisor to the State or its agencies which he represents in a civil capacity).

Without question, DCA was one of the victims of any alleged criminal activity and its commissioner, when asked if the release discharged Dean from any criminal liability, stated "[t]hat's what it says."

Since DCA was represented by the Attorney General in the matter of the DCA grant investigation and release and since this same Attorney General, as constitutionally authorized to do, initiated the prosecution, it would seem incongruous if this matter could not be settled by agreement between the agency/victim represented by the Attorney General when a "private" settlement of a criminal matter may occur between "private parties," the victim and the perpetrator. See *Goolsby v. Bush*, 53 Ga. 353 (1874); *Childs v. State*, 118 Ga. App. 706 (165 SE2d 577) (1968).

In any event, the arguments presented by both dissents as to whether or not the Attorney General and the victim agency could simultaneously settle both a civil dispute between an agency victim (DCA) and, at the same time, resolve by declining to prosecute any criminal violations against society's interest was not argued below. To so hold now would be to accept the premise that the "wrong for any reason" rule applies.

2. Even assuming that there had not been technical compliance with the mandates of *Hanson*, the concept of equitable immunity was relied upon by Dean and seems particularly applicable in this situation. *Rowe v. Griffin*, 676 F2d 524, 526 (11th Cir. 1982); *Commonwealth v. Ginn*, 587 A2d 314 (Sup. Court Penn. 1990). The concept has been previously acknowledged by Georgia courts in the discussion in *Hanson* of *United States v. Ford*, 99 U. S. 594 (25 LE 399) (1878) and "an equitable right to executive clemency."

3. The remaining arguments made here were not made below and will not be considered here for the first time. *Peters v. State*, 206 Ga. App. 143, 145 (424 SE2d 372) (1992).

*Judgment affirmed. Birdsong, P. J., Cooper and Johnson, JJ., concur. Smith, J., concurs in the judgment only. McMurray, P. J., Beasley, P. J., and Blackburn, J., dissent. Pope, C. J., disqualified.*

McMurray, Presiding Judge, dissenting.

The release upon which appellee's plea in bar is predicated does not satisfy the requirement of *State v. Hanson*, 249 Ga. 739, 744 (2)

(295 SE2d 297) that "a valid promise to forgo prosecution based on prosecutorial discretion . . . must . . . contain a description of the crimes or transactions in regard to which an individual is excused from prosecution." Id. at 744. It is beyond dispute that the release appellee relies upon does not contain on its face any language satisfying this requirement as there is no reference to any specific crime, to the Polk County grants, or to any misrepresentation in regard to the Polk County grants. The demand letter referenced in the release was not introduced into evidence before the superior court, where the burden of proof rested upon appellee Dean, and is not part of the record on appeal. Thus, the reference to that letter, the contents of which is unknown to this court or the trial court, cannot be viewed as curing the absence of a description of the crimes as required by the *Hanson* decision. It follows that appellee Dean did not prove the existence of a valid promise to forgo prosecution.

The analysis applicable to a determination of the extent to which appellee Dean is entitled to the benefit of an invalid promise by the prosecutor is also addressed in *Hanson*, at 744 (3). The evidence as developed in the case sub judice is similar to that in *Hanson* in that it shows an overly broad promise beyond the authority of the prosecutor, being in the nature of a blanket amnesty or pardon, and shows that the promisee has performed his part of the bargain.

In *Hanson*, at 746-747 (3), a prospective requirement of court approval for prosecutorial promises to forgo prosecution was announced predicated in part on this court's decision of *Smith v. State*, 74 Ga. App. 777 (41 SE2d 541) and particularly upon certain language from that decision which was quoted with approval in *Hanson*. This included a statement that: " 'the weight of authority upholds the proposition that if such an agreement is made with the prosecuting attorney alone, without the consent or advice of the court, it is of no effect as a protection . . . if he is afterwards placed on trial in violation of that agreement.' *Smith v. State*, supra at 785." *Hanson v. State*, 249 Ga. 739, 746 (3), supra.

Based upon this language, my conclusion is that any agreement to forgo prosecution will not become binding until approved by the court, that until such approval has been granted the prosecutor may renounce the agreement by any means including commencement of a prosecution of the promisee, and that once the agreement is renounced by the prosecutor the trial court may not approve the defunct agreement. Therefore, in my view the trial court's purported approval of the release agreement in the case sub judice is void and of no effect.

I further question whether public policy permits the enforcement of an agreement to forgo criminal prosecution in exchange for a payment of money. If the State may agree to forgo prosecution of this

misdemeanor offense for a payment of $15,000 then what is the State's price to forgo prosecution of a felony such as murder.

*Hanson* deals with a practice of promising to forgo prosecution of one crime in exchange for information or cooperation which will aid in the prosecution of another crime. Often the promisee is induced to waive the protection of constitutional rights, particularly those under the Fifth and Sixth Amendments, or otherwise act to his detriment. The process of forgoing prosecution in exchange for such consideration is approved due to pragmatic recognition of the compromises needed in order to prove and punish certain crimes, such as those where all who may bear useful testimony will be implicated. These factors are entirely absent from the case sub judice. If appropriate, the money may be returned to appellee Dean with no prejudice resulting to him.

Furthermore, I do not agree that the concept of equitable immunity is applicable to the case sub judice. Before this concept becomes relevant there must be a sufficient promise to which the equitable principles may attach. In Georgia, reference to the *Hanson* decision provides the parameters of such a promise. "In the future, an agreement to forgo prosecution must be in writing, must specifically set forth the transactions to which the promise relates, and must be approved by the court." Id. at 747. As already noted, two of these parameters were not satisfied in the case sub judice.

Nor is this a case to which the concept of private settlement of a criminal case is applicable. "Because a crime is by definition a public wrong against the State, it is not usually an acceptable defense that the person wronged by a criminal has condoned the offense. . . . Neither repayment of the victim nor settlement between the defendant and victim will constitute a bar to conviction of the offender. *Williams v. State*, 105 Ga. 606 (2) (31 SE 546); *Lowe v. State*, 111 Ga. 650, 652 (36 SE 856)." *Pratt v. State*, 167 Ga. App. 819, 820 (1) (307 SE2d 714). Although the cases of *Goolsby v. Bush*, 53 Ga. 353 and *Childs v. State*, 118 Ga. App. 706 (165 SE2d 577), cited by the majority, may present a narrow exception to this general rule, that exception is not applicable to the case sub judice. Not only does the fact that this case proceeds by indictment as opposed to accusation preclude application of this exception (see *Pratt v. State*, 167 Ga. App. 819, 820, supra), the nature of the crime itself being an offense against the government and thus against the whole of society makes it inappropriate for application of the private settlement concept. See *Childs v. State*, 118 Ga. App. 706, 708 (3), supra.

Finally, I would construe the release agreement between appellee Dean and the Georgia Department of Community Affairs (hereafter "DCA") as relating only to civil claims. The Deputy Attorney General who represented DCA was not a party to the agreement, he was

merely an attorney representing one of the parties. The document purports to be a full release of any "theory of recovery whatsoever which DCA now claims. . . ." The DCA has no responsibility for the prosecution of criminal offenses, therefore there is no rational basis for supposing that it might contract to forgo a criminal prosecution.

I, therefore, respectfully dissent as I would hold that the superior court erred in attempting to supply its approval under these circumstances and in granting appellee's plea in bar.

I am authorized to state that Judge Blackburn joins in this dissent.

BEASLEY, Presiding Judge, dissenting.

I agree with the other dissent in that it was error to grant appellee's plea in bar, although I do not concur in all of the analysis. A controlling factor is that the agreement releasing appellee from "any and all such claims . . . either criminal. . ." etc. was not made with the prosecuting attorney who would have the power to exercise prosecutorial discretion in the matter. It was made instead with a state agency head, for that executive agency. He was no more than the potential prosecuting witness and has no "prosecutorial authority" to exercise. Although he could agree not to make a complaint to the district attorney or to the grand jury, he would have to obey a subpoena if the district attorney independently sought an indictment or special presentment. *State v. Hanson*, 249 Ga. 739 (295 SE2d 297) (1982) and *Smith v. State*, 74 Ga. App. 777 (41 SE2d 541) (1947), both involve agreements with the district attorney or prosecuting attorney. That is missing here.

DECIDED MARCH 15, 1994 —
RECONSIDERATION DENIED APRIL 1, 1994 —

*Michael J. Bowers, Attorney General, Harrison W. Kohler, Charles M. Richards, Senior Assistant Attorneys General*, for appellant.

*Barnes, Browning, Tanksley & Casurella, Roy E. Barnes, George T. Smith*, for appellee.