304 Ga. 532
FINAL COPY

S18A0959. LORD v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Manuel G. Lord, acting pro se, appeals his

conviction for malice murder and related crimes, raising numerous enumerations

of error.[1] For the reasons set forth below, we affirm.

---

[1] On March 20, 1998, Lord was indicted for three counts of malice murder (one for each of three victims), three counts of felony murder (one for each of three victims), three counts of aggravated assault (one for each of three victims), and three counts of possession of a firearm during the commission of a felony in connection with the shooting deaths of Chauncey Fleming, Nekeba Turner, and Eddie Lee McMillian. Following a jury trial ending on February 25, 1999, Lord was found guilty of all counts except for the malice murder of Turner and McMillian. Lord was sentenced to consecutive life sentences for the malice murder of Fleming and the felony murders of Turner and McMillian, and five consecutive years for each count of firearm possession. On March 3, 1999, Lord filed a motion for new trial, and subsequent amended motions were filed by new counsel on November 8, 2000 and December 19, 2001. After that date, Lord's motion appears to have languished. See Owens v. State, 303 Ga. 254, 258 (4) (811 SE2d 420) (2018) ("We do not condone . . . inordinate delay[s] in . . . motion for new trial proceeding[s, as t]hese delays put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial.") (citation and punctuation omitted). From February 28, 2011 through December 9, 2014, Lord filed a number of both pro se and counseled amended motions. Following a hearing, the trial court denied Lord's motion for new trial

1. Viewed in the light most favorable to the verdict, the facts show that Lord, Damion Braithwaite, Dukar Watson, and Anthony Davis were friends who regularly spent time together and used Lord's vehicle to travel around, as Lord was the only one who owned a car.[2] The four men later met James Ward, Jr., who joined the group. On February 4, 1996, Lord and his four accomplices conspired to rob Chauncey Fleming, whom Watson already knew. Watson called Fleming from Ward's home phone to arrange to spend the evening of February 5, 1996 with him. All five accomplices rode to Fleming's apartment in Lord's car. Fleming let the five into the apartment, and they proceeded to smoke marijuana and watch television in the living room. At some point, Braithwaite found a gun hidden in the sofa where he was sitting, and he signaled to the others that the robbery should begin.

Fleming was subdued at gunpoint, tied up, gagged, and left on the living

on March 31, 2017. Lord then timely appealed to this Court; however, that appeal was remanded to the trial court to determine whether Lord wanted to proceed pro se in his appeal. On February 13, 2018, the trial court granted Lord's motion to proceed pro se. Again, Lord timely appealed, and his case, submitted on the briefs, was docketed to the April 2018 term of this Court.

[2] This Court has previously affirmed the convictions of Watson and Braithwaite. See Watson v. State, 274 Ga. 689 (558 SE2d 704) (2002); Braithwaite v. State, 275 Ga. 884 (572 SE2d 612) (2002).

room floor. The accomplices then searched the apartment and found Eddie Lee McMillian and Nekeba Turner asleep in the bedroom. McMillian and Turner were pulled out of the bed and onto the floor while the defendants searched for money and valuables. Afterward, Lord and his accomplices decided to kill Fleming, McMillian, and Turner. They devised a plan in which each accomplice would shoot a victim. That way, one accomplice could not incriminate another without consequences. Davis shot McMillian in the back. Watson shot McMillian in the head. Braithwaite shot Turner in the head. Lord shot Fleming in the head. Ward was the only accomplice who did not shoot one of the victims. The same weapon was used to kill all three victims.

As no fingerprints of potential suspects were found at the scene, the investigation went cold until November 24, 1997. On that day, Detective Strozier received a call from Hafitha Braithwaite Miller, the wife of co-defendant Braithwaite. She provided details of the crime scene that had not been released to the public which she learned from Braithwaite, and she implicated all five accomplices in the murders. Detective Strozier followed up on Miller's information and learned that Lord and Ward had been arrested by Atlanta police with a gun on February 16, 1996 — eleven days after the

3

murders. The weapon was retrieved from police property, and subsequent ballistics testing showed that the gun had been used to murder the victims at Fleming's apartment.

Both Ward and Davis testified at Lord's trial, each corroborating the other and providing independent details of the crimes as set forth above. In turn, this accomplice testimony was generally consistent with the information that Miller had learned from her husband, and the testimony of Ward, Davis, and Miller was also consistent with the evidence found at the crime scene.[3] Also, Ward testified that he had obtained the murder weapon from Braithwaite following the murders and that Lord was with him when he was arrested with the murder weapon shortly after the triple homicide.[4]

This evidence was more than sufficient to enable the jury to find Lord

---

[3] At the crime scene, the victims were discovered in the locations described by Ward and Davis, restrained and shot in the manner the accomplices recounted, and covered with either blankets or pillowcases to muffle noise consistent with the accomplices' version of events.

[4] In many of his enumerations, Lord attacks the general credibility of the witnesses who testified against him. These arguments, however, are misplaced, as "decisions regarding credibility are uniquely the province of the trier of fact." Harrison v. State, 283 Ga. 518, 520 (661 SE2d 536) (2008).

4

guilty of the crimes for which he was convicted beyond a reasonable doubt.[5]

Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); OCGA § 16-2-20 (parties to a crime).[6]

2. In two related enumerations of error, Lord contends that the trial court erred by allowing Davis's trial attorney to pretend to participate in jury selection after Davis entered a guilty plea during the jury selection process. We disagree.

The record reveals that Lord and Davis were originally going to be tried together, but Davis pled guilty during the second day of jury selection. Lord then moved for a mistrial and asked to start over with jury selection. Lord argued that the existing venire might draw a negative inference if Davis and his attorney were no longer sitting at the defense table when voir dire resumed. The

---

[5] Though Lord also contends that the verdict was strongly against the weight of the evidence, that determination is solely within the province of the trial court. See Jordan v. State, 303 Ga. 709 (5) (814 SE2d 682) (2018).

[6] In his argument, Lord raises concerns about the ballistics evidence because the tests were performed by Bernadette Davy, a firearms examiner for the State who was subsequently fired for not observing strict protocols in all of the cases to which she was assigned. See Roscoe v. State, 286 Ga. 325 (687 SE2d 455) (2009) (recounting reasons for Davy's termination). Lord, however, bases his argument solely on speculation and conjecture, and he ignores the fact that Ward independently testified that the gun in his possession at the time of his arrest and later tested by Davy was given to him by Braithwaite directly following the murders.

5

trial court denied the motion. At the time, counsel for Lord and Davis agreed that, after Davis pled guilty, Davis and his attorney would continue to appear to participate in jury selection so as to not alert the jury to the fact that Davis had entered a plea.[7]

Though Lord's counsel stated that he was making a motion for mistrial, the reasons he stated for making this motion indicate that, in substance, he was requesting a new jury panel.[8] See Sharpe v. State, 272 Ga. 684, 687 (5) (531 SE2d 84) (2000) ("[T]here is authority for disregarding the nomenclature of a defendant's premature motion for mistrial when the clear import of the motion is that the jury panel be excused and another panel be made available"). Treating Lord's request as such a motion for a new jury panel, there was no abuse of discretion in the trial court's decision to deny it. The corrective measures in this case, to which Lord agreed, succeeded in concealing from the jury for the remainder of voir dire that Davis had pled guilty. Thus, the curative measure

---

[7] Contrary to any contention otherwise by Lord, Davis's counsel did not actually participate in jury selection following Davis's guilty plea.

[8] "The time for making a motion for mistrial is not ripe until the case has begun, and the trial does not begin until the jury has been impaneled and sworn." Ferguson v. State, 219 Ga. 33, 35 (3) (131 SE2d 538) (1963).

6

was sufficient to ensure that the remainder of the jury selection process was fair to Lord. Lord received a jury "free from even a suspicion of prejudgment or fixed opinion." (Citations and punctuation omitted.) Callaway v. State, 208 Ga. App. 508, 511 (2) (431 SE2d 143) (1993). Moreover, only a second alternate was selected during that time period after Davis pleaded guilty, and she did not participate in deliberations. There was nothing inherently prejudicial about this procedure, and, in any event, there is evidence that Lord agreed to it. This enumeration fails.

3. Lord contends that the trial court erred by denying his Batson challenge to the State's decision to strike two African-American men from the jury panel. See Batson v. Kentucky, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986).

The record shows that Lord made a Batson challenge on the basis that the prosecution had used only two strikes and they were both on African-American men. The trial court found that Lord had not made a prima facie case of discrimination, but it still asked the prosecution to give race-neutral reasons for the strikes. The prosecutor explained that (1) Juror 29 knew one of the defense attorneys and had communicated with Lord's family even after they were pointed out by defense counsel, and (2) Juror 37 had indicated that he believed

7

his brother-in-law had been "railroaded" and wrongfully convicted of murder. The court then reiterated its finding that no prima facie case of discrimination had been made and also found that the State had not struck either of the potential jurors for a discriminatory purpose.

A Batson challenge has three parts:

(1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

(Citation and punctuation omitted.) Coleman v. State, 301 Ga. 720, 723 (4) (804 SE2d 24) (2017). The question whether the trial court correctly decided that no prima facie showing of racial discrimination had been made is moot in this case because the trial court proceeded to the second step in the Batson analysis. See Hernandez v. New York, 500 U. S. 352, 359 (II) (A) (111 SCt 1859, 114 LE2d 395) (1991) (plurality) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); Lewis v. State, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993) (same).

8

"At the second step [of a <u>Batson</u> challenge], all that is required is for the proponent of the strike to provide a *facially* race-neutral explanation for the strike; this explanation need not be 'persuasive, or even plausible.'" (Citation omitted; emphasis in original.) <u>Coleman</u>, supra, 301 Ga. at 723 (4). There is no contention in this case that the reasons given by the State were not facially race-neutral.

As the final part of the <u>Batson</u> analysis, the trial court "'makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other circumstances that bear upon the issue of racial animosity.'" (Citation omitted.) <u>Coleman</u>, supra, 301 Ga. at 723 (4). "'A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous.'" (Citation omitted.) <u>Woodall v. State</u>, 294 Ga. 624, 627 (3) (754 SE2d 335) (2014). Here, the trial court found no discriminatory intent on behalf of the State, and Lord has provided no argument or evidence to overcome the great deference owed to this determination. Therefore, Lord's contention must fail.

4. Lord maintains that the trial court erred by denying his motion for a

mistrial following an outburst from a woman sitting in the courtroom.[9] The record shows that, when Detective Strozier was testifying about graphic pictures of the crime scene, a disruption occurred in the courtroom. The trial court characterized the disruption as a "clear emotional reaction" in the form of "heavy breathing" from a female in the back row. The trial court immediately removed the jury, and Lord made a motion for mistrial, which the trial court denied. Lord then requested that the court instruct the jury to try the case on the facts and evidence and to ignore any outside influences. The trial court gave the requested instruction. Subsequently, no further outbursts occurred.

"'Measures to be taken as a result of demonstrations and outbursts which occur during the course of a trial are matters within the trial court's discretion unless a new trial is necessary to [e]nsure a fair trial.'" (Citation omitted.) Green v. State, 300 Ga. 707, 710 (2) (797 SE2d 863) (2017). "Given the trial court's 'prompt, thorough, and curative action,' the trial court did not abuse its discretion by denying [Lord's] motion for a mistrial." (Citation omitted.) Thomason v. State, 281 Ga. 429, 434 (13) (637 SE2d 639) (2006) (the trial court

_____

[9] Prior to trial, the trial court granted a motion in limine that emotional outbursts would not be permitted.

did not abuse its discretion by denying the defendant's mistrial motion and instead giving a curative instruction after the mother of the victim pointed at the defendant and asked, "Why did you do it?").

5. In related enumerations with varied and inconsistent arguments, Lord appears to contend that (a) the admission of Braithwaite's statements through Miller was a violation of Bruton v. United States, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968); (b) the prosecution failed to make a prima facie showing of a conspiracy in order to render Braithwaite's statements through Miller's testimony admissible, thereby violating former OCGA § 24-3-5;[10] and (c) Miller's testimony about Braithwaite's statements violated Lord's confrontation rights under the Sixth Amendment. Lord's contentions lack merit.

(a) There was no Bruton violation in this case. Bruton applies only to out-of-court statements by non-testifying co-defendants that are "testimonial" in nature. Billings v. State, 293 Ga. 99 (4) (745 SE2d 583) (2013). A statement is testimonial if its "primary purpose . . . was to establish evidence that could be used in a future prosecution." Pitts v. State, 280 Ga. 288, 289 (627 SE2d 17)

---

[10] Under the new Georgia Evidence Code, the co-conspirator hearsay exception is now codified at OCGA § 24-8-801 (d) (2) (E).

(2006). Here, the statements made by Braithwaite to Miller, his wife, were not testimonial, as they were not intended to establish evidence for future prosecution. See Favors v. State, 296 Ga. 842 (2) (770 SE2d 855) (2015). Bruton is not applicable here.

(b) Lord contends that the State failed to make out a prima facie case of conspiracy to qualify Braithwaite's statements for the co-conspirator hearsay exception. At the time of Lord's trial, former OCGA § 24-3-5 provided that "the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." "The co-conspirator hearsay exception permit[ted] admission of the hearsay statement of a co-conspirator, made in the course of the conspiracy, so long as a prima facie case of conspiracy [was] established apart from the hearsay statement itself." (Citation omitted.) Crawford v. State, 294 Ga. 898, 902 (2) (757 SE2d 102) (2014). Here, there was ample evidence of conspiracy contained in the direct testimony of Davis and Ward, who testified regarding the plan to rob Fleming and the actual murders. See Copeland v. State, 266 Ga. 664, 665 (2) (a) (469 SE2d 672) (1996) (in-person testimony of one co-conspirator sufficient to establish existence of a conspiracy that includes an out-of-court co-conspirator), overruled on other

12

grounds by <u>McClendon v. State</u>, 299 Ga. 611 (4) (b) (791 SE2d 69) (2016). In addition, there was clear evidence that, at the time Braithwaite spoke to Miller, the conspiracy had not ended. "For purposes of the hearsay exception, a conspiracy is deemed to endure so long as the parties thereto attempt to conceal either the crime itself or the identity of the perpetrators." <u>Franklin v. State</u>, 298 Ga. 636, 639 (2) (784 SE2d 359) (2016). Detective Strozier's testimony established that the concealment phase was still in effect at the time that Braithwaite divulged details of the murder to Miller in November 1997, as the investigation had no leads for approximately a year and a half, the co-conspirators were still at large, and there was evidence that four of the five co-conspirators shot the victims for the purpose of ensuring continued concealment. See, e.g., <u>Grimes v. State</u>, 296 Ga. 337, 346 (2) (a) (iii) (766 SE2d 72) (2014) ("concealment phase was ongoing because the statements in question were not made to police, the investigation was ongoing, and the other conspirators . . . were still at-large"). Accordingly, the State made a prima facie showing of conspiracy, and the evidence showed that the conspiracy was ongoing at the time Braithwaite divulged details of the crime scene to Miller. Braithwaite's statements were admissible under former OCGA § 24-3-5.

13

(c) Lord argues that the statement made by Braithwaite violated Lord's Sixth Amendment right to confront him. Braithwaite's statements to his wife during the concealment phase of the conspiracy were not testimonial, and there was no error in the admission of Miller's testimony regarding these statements. See Young v. State, 291 Ga. 627, 630 (3) (732 SE2d 269) (2012).

6. Without factual support, Lord asserts that he was treated unfairly during the plea bargaining process because his trial counsel had an "acrimonious" relationship with the prosecutor, and, as a result, Lord's constitutional rights were violated. Lord's argument, however, is based on the false premise that he had some constitutional right or entitlement to a plea bargain in the first place. He did not.

> The State is afforded "broad discretion in making decisions . . . about who[m] to prosecute, what charges to bring, and which sentence[s] to seek." (Footnotes omitted.) State v. Wooten, 273 Ga. 529, 531 (2) (543 SE2d 721) (2001). The authority and discretion to plea bargain rest with the State, see State v. Dawson, 203 Ga. App. 854, [855] (1) (419 SE2d 30) (1992), and it is within the State's purview to place conditions on any such plea. See Mergel v. State, 198 Ga. App. 759, 760 (402 SE2d 800) (1991); see also Sanders v. State, 280 Ga. 780, 782 (2) (631 SE2d 344) (2006) ("a defendant has no constitutional right to enter a guilty plea"); Harris v. State, 167 Ga. App. 153, [155] (6) (306 SE2d 79) (1983) ("[t]here is no constitutional right to plea bargain"). "[The] authority of the prosecutor to bargain is inherent in his office and is

14

of utmost importance in the orderly administration of criminal justice." State v. Hanson, 249 Ga. 739, 743 (1) (295 SE2d 297) (1982).

State v. Kelley, 298 Ga. 527, 529-530 (783 SE2d 124) (2016). Therefore, Lord's contention lacks merit, as he claims an entitlement to a plea bargain that he was not owed.

7. Lord contends that trial counsel rendered ineffective assistance by failing to: (a) object to a comment by the prosecutor purportedly regarding the credibility of a witness; (b) object when the prosecutor allegedly commented on Lord's invocation of his right to counsel; (c) object to a purported "golden rule" argument made by the prosecutor during closing arguments; (d) object to testimony that the murder weapon was confiscated at the time that Lord and Ward were arrested for an unrelated crime shortly after the murders; and (e) timely impeach Miller with a certified copy of her conviction for forgery.

> In order to succeed on his claim[s] of ineffective assistance, [Lord] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. Strickland v. Washington, 466 U. S. 668 (104 SC[t] 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong. Id. at 697 (IV); Fuller v. State, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's

15

decision, "'[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Wright v. State, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012). Furthermore, "[t]rial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) McNair v. State, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014).

(a) Lord contends that trial counsel rendered ineffective assistance by failing to object to a comment by Detective Strozier regarding his decision to speak with and investigate things revealed to him by Miller. After Detective Strozier testified that Miller described the events on the night of the murder, the State asked, "And did *that information* seem credible to you?" (Emphasis supplied.) Detective Strozier responded that it did (and that the lead was worth pursuing) because Miller knew details of the crime scene not available to the public. In its order denying Lord's motion for new trial, the trial court found that Detective Strozier was not giving his opinion on Miller's general credibility, rather he was giving his reasoning for following up on the leads she provided.

16

This analysis is correct. A review of the testimony in context reveals that Detective Strozier was discussing the accuracy of the initial information provided by Miller, not Miller's general character for truthfulness. Therefore, Lord's contention is not factually supported by the transcript, and any objection made by trial counsel for the reasons argued by Lord would be misplaced. "[T]he failure to make a meritless objection cannot amount to ineffective assistance." Bradley v. State, 292 Ga. 607, 614 (5) (740 SE2d 100) (2013).

(b) Lord contends that trial counsel rendered ineffective assistance by failing to object when the prosecutor commented on Lord's decision to invoke his right to counsel. Lord's contention is misplaced and unsupported. Lord's trial counsel, not the prosecutor, asked Detective Strozier on cross-examination whether he had ever taken a statement from Lord. Trial counsel did so in order to argue that Detective Strozier lied to Ward that Lord had given a statement in order to induce Ward to talk. Again, the record shows that Lord's contention is factually inaccurate, and any objection would have been meritless. There was no ineffective assistance. Bradley, supra, 292 Ga. at 614 (5).

(c) Lord contends that trial counsel rendered ineffective assistance by failing to object to a "golden rule" argument made during closing. The argument

17

in question, however, was not a "golden rule" argument — it did not "ask[ ] the jurors to place themselves in a victim's position." Humphrey v. Lewis, 291 Ga. 202, 217 (V) (A) (iv) (728 SE2d 603) (2012); Braithwaite v. State, 275 Ga. 884 (2) (b) (572 SE2d 612) (2002). Instead, the prosecutor called into question Lord's alibi and the credibility of his parents' testimony supporting that alibi. The prosecutor invited the jurors to put themselves in Lord's *parents'* shoes and ask themselves if they would have waited over a year to tell police that their son was home with them at the time of the murders. The prosecutor then argued that the testimony was too coordinated and too specific to be believed. As discussed above, this is not a "golden rule" argument, so Lord's contention that trial counsel rendered ineffective assistance in this regard fails. See Humphrey, supra.

(d) Lord contends that trial counsel rendered ineffective assistance by failing to object to testimony that the murder weapon was confiscated at the time that Lord and Ward were arrested for an unrelated crime shortly after the murders. Specifically, Lord argues that this testimony violated a motion in limine granted by the trial court which required the State to refrain from eliciting testimony that the gun was in Lord's possession. The trial court ruled this way

because the gun was found under the cushions of a couch in the same room as Ward and Lord at the time of their arrest, but not in either co-defendant's immediate possession. Contrary to Lord's contentions, the record shows that the State and its witnesses complied with the motion in limine. While there was testimony of the gun's discovery, there was no attribution of the gun to Lord. Moreover, Ward affirmatively testified that he had been in possession of the gun, as Braithwaite had given it to Ward following the murder of the victims in this case. Again, because Lord's contention is not factually accurate, his argument fails, especially in the context of a claim of ineffective assistance.

(e) Lord contends that trial counsel rendered ineffective assistance by failing to impeach Miller with a certified copy of her prior conviction for forgery at the time of her testimony. The record shows that, although trial counsel did not impeach Miller with her prior conviction during her testimony, he did introduce that evidence prior to closing arguments and referenced it during closing arguments. So, the jury was aware of Miller's prior conviction and was capable of using it to assess Miller's credibility. Lord has not shown deficient performance in this regard because the decision to introduce the conviction after Miller's testimony is not so patently unreasonable that no

competent attorney would make that choice. McNair, supra.

8. Lord contends that his constitutional right to a speedy appeal was violated. Because Lord made no showing of prejudice, we disagree.

In Chatman v. Mancill, 280 Ga. 253, 256-260 (2) (a)-(e) (626 SE2d 102) (2006), we determined that constitutional speedy appeal claims in criminal cases in which a death sentence was not imposed should be evaluated by application of the following "modified Barker factors": length of the delay, reason for the delay, defendant's assertion of his right, and prejudice, i.e., whether the delay prejudiced the defendant's ability to assert his arguments on appeal and, if so, whether the delay prejudiced the defendant's defenses in the event of a retrial or resentencing. Id. See also Barker v. Wingo, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972). "In determining whether an appellate delay violates due process, prejudice, unlike in the speedy trial context, is not presumed but must be shown." (Punctuation omitted.) Veal v. State, 301 Ga. 161, 168 (3) (800 SE2d 325) (2017), quoting Glover v. State, 291 Ga. 152, 154 (3) (728 SE2d 221) (2012). Appellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different. Chatman, supra, 280 Ga. at 260-261 (2) (e).

With regard to the first three factors, the trial court found that the delay was unduly long, the reasons for the delay were mostly attributable to the State, and Lord did attempt to move the process along from time to time by writing pro se letters to the trial court. We acknowledge the inordinate delay in his case. See Owens v. State, 303 Ga. 254 (4) (811 SE2d 420) (2018). However, Lord has wholly failed to make any showing that he was prejudiced by the delay. Lord makes only a bare assertion that the delay resulted in "loss of recollection, evidence, witnesses, testimony etc." and that "the prejudicial effect is obvious." This is simply not enough to warrant the reversal of a conviction. See Payne v. State, 289 Ga. 691, 695 (2) (b) (715 SE2d 104) (2011) ("Payne's generalized speculation about the delay's effect on witness memories and evidence is not the kind of 'specific evidence' required to show prejudice in the appellate-delay context."); Loadholt v. State, 286 Ga. 402, 406 (4) (687 SE2d 824) (2010) ("Loadholt's only claim of prejudice is the bare assertion that by the passage of time counsel and witnesses' memories as to the events of the crimes are less clear. Thus, he has failed to offer the specific evidence required to show that the delay has prejudiced his appeal[.]" (punctuation omitted)). Therefore, Lord's contention that his right to a speedy appeal was violated must be rejected on the

21

basis that no prejudice has been shown.

9. Lord's remaining enumerations of error are accompanied by no argument and no citations to authority. Therefore, these enumerations are deemed abandoned under Supreme Court Rule 22. See <u>Moss v. State</u>, 298 Ga. 613 (5) (e) (783 SE2d 652) (2016).

<u>Judgment affirmed. All the Justices concur</u>.

Decided October 9, 2018.

Murder. Fulton Superior Court. Before Judge Downs.

Manuel G. Lord, pro se.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.